UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
NORTHERN DIVISION


FILED
JAN 0 4 2016

| | |
|---|---|
| MICHAEL SEIBEL,<br><br>　　　　　　Petitioner,<br><br>vs.<br><br>UNITED STATES OF AMERICA,<br><br>　　　　　　Respondent. | 1:14-CV-01022-CBK<br>1:11-CR-10021-CBK<br><br>OPINION AND ORDER<br>DENYING MOTION TO VACATE<br>AND ORDER DENYING<br>CERTIFICATE OF APPEALABILITY |

### INTRODUCTION

Petitioner was convicted of two counts of sexual abuse of a minor and two counts of abusive sexual contact. He was sentenced to a total sentence of 71 months custody. He appealed and the United States Court of Appeals for the Eighth Circuit affirmed. United States v. Seibel, 712 F.3d 1229 (8th Cir. 2013). Petitioner filed a motion to vacate, set aside, or correct sentence pursuant to 28 U.S.C.§ 2255, contending that (1) he received ineffective assistance of tribal court counsel, (2) received ineffective assistance of federal trial counsel, and (3) the prosecutor committed misconduct.

### BACKGROUND

Petitioner and his wife, Cindy, were foster parents for three very young children beginning in 1997. SS, a girl, was born July 26, 1994, MS, a boy, was born August 19, 1995, and PS, a girl, was born November 23, 1996. In July 1997, when SS was nearly three years old, MS was nearly two years old, and PS was nearly eight months old, the children, along with their older siblings, were removed from their home amid allegations that their older siblings had been sexually abused by their natural father. SS, MS, and PS were eventually placed in the Seibel's foster care and were adopted by the Seibels seven years later in 2003. The adoption contract prepared by the Department of Social Services disclosed that the children had a possible history of fetal alcohol syndrome, fetal alcohol effect, post traumatic syndrome, academic problems, anxiety disorders, and sexual abuse.

None of the foregoing were ever diagnosed by a professional and no person was ever charged with having sexually abused the children prior to their placement with the Seibels.

The children began having behavioral problems at home and started seeing Pat Poitra, a counselor at Three Rivers Mental Health Center. They did not report any physical or sexual abuse to Poitra. PS and SS began seeing Elisa Kelley, another counselor at Three Rivers, in August of 2009. Kelley would see the girls at the McLaughlin school during the school year and at the Seibel home during the summer. In the fall of 2010, MS went to live at the Pierre Indian Learning Center.

On December 6, 2010, PS reported to her counselor, Elisa Kelley, that her father, the petitioner, physically abused her and her sister. Kelley reported the abuse to the Standing Rock Sioux Tribe Child Protection Services and the report was referred to the Bureau of Indian Affairs Office of Justice Services.

PS was interviewed on December 8, 2010, in her school principal's office by Donovan Wind and Misty Plenty Holes, special agents with the Bureau of Indian Affairs. The school principal, Lisa Bielawski, and Waylan Bad Hand, a Standing Rock Sioux Tribe child protection worker, were also present. Plenty Holes, Bad Hand, and Bielawski asked questions of PS.

PS reported that her dad had been touching her vagina since she was six years old. She also reported that, on at least eleven occasions, he had tried to have intercourse with her, that when he did so she would cry, scream, and try to run out of the room, and that he would drag her back in and put a pillow on her face. She reported that she was made to touch his penis and that he had tried to force her mouth on his penis. She reported that she told her mother but that her mother did nothing. She reported that, on the most recent Sunday night, he came into her bedroom with a condom and tried to get into bed with her. He told her that if she screamed, she would get slapped. She reported that she hollered for her mother and that he got mad and hit the wall, causing a hole.

On December 8, 2010, the children were removed from the Seibel home by the Standing Rock Sioux Tribe Child Protection Services and placed at the Lake Oahe Group

2

Home in Ft. Yates, North Dakota. The tribal court ordered petitioner to have no contact with the children and Cindy was awarded supervised visitation. SS was soon placed in a foster home in Ft. Yates. She left the foster home in December and was placed at the New Beginnings Center in Aberdeen, South Dakota.

PS was interviewed by Shannon Hilfer, a forensic interviewer at the Dakota Children's Advocacy Center in Bismarck, North Dakota, on December 20, 2010. PS, who was then age 14, reported that petitioner touched her genitals more than five times and forced her to touch his genitals more than five times. She reported that petitioner hit her and once put a pillow over her head when she yelled for her mother.

SS was interviewed by Federal Bureau of Investigation special agent Ten Miller on February 4, 2011, at the New Beginnings Center. She was age 16 at the time of the interview. Lynn McCafferty, a counselor at the center, and Joan Halvorson, a victim specialist with the FBI, were also present. SS reported that her father would repeatedly hit and beat PS and once hit PS with a belt. He would less frequently hit SS. SS claimed to have reported the physical abuse to Cindy. SS reported that PS told Cindy their father sexually abused her. SS also reported that their father had sexually abused her as well, including digital penetration, being forced to touch his penis, him performing oral sex upon her and vaginal sexual intercourse. SS reported that the sexual abuse began when she was age 11 and continued until age 15. She stated that she reported the sexual abuse to Cindy many times.

Jim Cerney testified that he was appointed by the Standing Rock Sioux Tribe as guardian ad litem for S.S. and P.S. on December 20, 2010. Rose Ann Wendell was retained by the Seibels to represent them in conjunction with tribal court abuse and neglect proceedings. Cerney testified that he met with Cindy at least twice prior to March 3, 2011, and that Cindy denied to him that the children ever told her about the abuse. Cindy wanted to regain custody of the children and Wendell corresponded with Cerney and the tribal investigator in an effort to make that happen. Wendell and Cerney arranged for Cindy to be interviewed on March 3, 2011. Cerney had made it clear that Cindy needed to convince him that she was cooperating with authorities and would

3

protect the children if they were returned home. Some time prior to that interview, Wendell claims she told the Seibels that Mike would have to obtain his own attorney but Wendell did not formally withdraw in tribal court until after March 3.

On March 3, 2011, Cindy was interviewed by police officer David Lawrence, F.B.I. Special Agent Ted Miller, Cerney, and Wendell. Wendell participated in that interview by telephone.

On March 18, 2011, P.S., Elena Roberts, who was PS's social worker from Child Protection Services, F.B.I. Special Agent Daniel Orr, B.I.A. officer Dave Lawrence, and Jim Cerney met Cindy at the Seibel home to determine whether or not there was a hole in the wall of PS's bedroom as she had claimed. The hole was in fact present where PS had described it but the hole had been repaired. PS' room had been painted and Lawrence testified that the room was "spotless" compared to the other rooms in the house. Cerney testified at trial that the girls' rooms had been "sanitized." Cindy had previously told Cerney that petitioner never punched a hole in the wall. Cerney testified that he confronted Cindy about her earlier statement and she then admitted to Cerney that petitioner had punched a hole in the wall but not because of any abuse. Cerney told Cindy that it looked like she and petitioner had engaged in a cover up and he was going to do everything he could to have petitioner indicted.

Although Cindy claimed petitioner was not living in the home, an empty pop bottle being used as a spittoon was left in PS's bedroom. Lawrence testified that he viewed that as an indication that petitioner had in fact been in the home because petitioner chews tobacco.

An indictment was filed on April 12, 2011, charging petitioner with 14 counts involving aggravated sexual abuse of a child under the age of 12, sexual abuse of a minor, abusive sexual contact, and child abuse, the victims being SS and PS. The sexual abuse is alleged to have occurred between 2002 and 2010. The abuse of SS was alleged to have begun when she was age eleven and continued until she was age sixteen. The abuse of PS was alleged to have begun when she was age six and continued until she was age fourteen.

4

A jury trial was conducted in August 2011.

PS testified at trial that her father started touching her in a sexual manner when she as about six years old, that he would touch her under her underwear and that it happened several times. She testified that he would get mad and tell her to shut up if she called out for her mother and that he would threaten to hit her. She testified that he would come into her bedroom at night and touch her and when she would call out for her mother, he would put a pillow over her face. She testified that he tried to remove her underwear and tried to have intercourse with her and tried to put his penis in her mouth. She testified that, when she was home from school ill, he would come home for lunch and try to touch her.

PS testified that, after the abuse started, she would avoid being at home and would ask to stay at "aunt Kayla's" house. She testified she saw her father touch her sister SS and would hear SS screaming in her room.

PS testified that she told her mother, that her parents subsequently argued, and that her father punched a hole in the wall. She testified that the abuse continued after she told her mother.

SS testified that the petitioner began touching her breasts under her clothing when she was eleven years old. She testified that eventually the abuse included petitioner penetrating her vagina with his fingers, forcing her to touch his penis with her hands, petitioner placing his mouth on her vagina, and, when she got older, sexual intercourse. The alleged abuse sometimes took place in her sister's bedroom. She did not yell or try to get help because she was afraid. The alleged abuse stopped when she was 15 years old.

SS testified that PS was also being sexually abused by petitioner, beginning when SS was 11 years old. SS heard PS screaming during one of those events.

SS testified that she told Cindy that petitioner was touching her and PS. The alleged abuse did not stop after that.

SS testified that petitioner had spanked her and she had witnessed petitioner slap PS in the face and on the back of the head. SS also testified that petitioner whipped PS

5

with a belt and he hit Cindy. She was afraid of petitioner and her mother appeared to be afraid of him. She stated that petitioner told her to keep the abuse secret.

SS has had difficulty in school and was on an Individualized Education Plan. Elena Roberts testified that, at the time of trial when SS was 17 years old, she was functioning at the age of a ten year old.

Cindy testified on behalf of the petitioner at trial. On cross-examination, the prosecutor asked if she had stated during the March 3 interview that petitioner admitted to some of the abuse. Cindy denied making any such statement during the interview. She testified that her daughters never told her they were being sexually abused.

The government called several witnesses in rebuttal. Cerney testified that, during the March 3 interview, Cindy stated that the girls had separately reported that petitioner had touched them. He testified that Cindy stated that she had talked to petitioner about the alleged touching and petitioner admitted to touching the girls' breasts when they were sitting in the living room with him in a chair. Cerney testified that Cindy went back and forth during the interview about whether the touching was accidental or intentional but that she ended up the interview by saying she now knows it was not an accident.

David Lawrence testified on rebuttal that Cindy told them during the March 3rd interview that both S.S. and P.S. told her, on different occasions, that petitioner had touched their breasts. The girls were ages 14 and 16 when they disclosed this touching to Cindy. According to Lawrence, Cindy stated that she asked petitioner about the touching and petitioner admitted touching the girls' breasts when he was holding them in a chair.

Wendell testified on rebuttal that Cindy is easily confused, that the three men present during the March 3rd interview were all asking Cindy questions, and that Cindy went back and forth during the interview about whether she talked to petitioner about the abuse and whether petitioner ever admitted touching the girls. Wendell did testify that Cindy never said petitioner admitted *intentionally* touching the girls improperly.

Recantation issues arose before trial and were the subject of inquiry during trial.

On July 19, 2011, Carol Nichols, a Social Work Coordinator at the Lake Oahe Group Home, brought PS to Mobridge in preparation for a hearing. When PS, Nichols,

and the federal prosecutor were in a room together, PS stated that "it didn't happen." She also stated that the damage to the wall in her bedroom did not happen the way she had previously reported. She reported that she was recanting (my words, not hers) because she wanted to go home to live with her mom. On August 5, 2011, Nichols brought PS to McLaughlin to meet with the federal prosecutor at City Hall. At that time, PS recanted her recent recantation, reporting again that the reason she had recanted was so that she could return home with her brother and sister. PS stated that her dad would not be there but would not disclose who gave her that information.

In July of 2011, Elena Roberts, the children's case manager from Standing Rock Sioux Tribe Social Services, had a conversation with PS and MS about concerns that PS was being pressured to recant. Both children avoided eye contact and appeared nervous.

SS wrote a letter to her mother while she was at New Beginnings Center asking for a second chance and asking to return home. She testified that PS told her that, if SS recanted, SS could return home.

On July 25, 2011, a Rule 412 hearing on petitioner's motion to allow evidence of the victims' prior sexual history was held in Aberdeen, South Dakota. Both SS and PS, as well as Cindy, were present at the hearing. Following the hearing, PS and SS were taken to a local McDonald's restaurant where Cindy, the petitioner, and other friends of petitioner who had come to the hearing to support petitioner were also dining. The Rev. Dennis Fonkert, the Seibel's pastor, testified that he just happened to be in Aberdeen that day and also came into the McDonald's restaurant. Carol Nichols testified that the girls did not wish to talk to the group but that Reverend Fonkert approached SS and began to talk to her. At trial, Fonkert testified that SS told him during that conversation to tell her father's attorney about their conversation. SS was called as a witness for the defense to testify about her conversation with Fonkert. SS testified at trial that, during the McDonald's conversation, SS told Fonkert that the sex abuse claims were not true. She did reiterate, upon cross-examination by the government, that her sex abuse claims were true.

7

PS testified at trial that she had Facebook communication with her mother and her brother about the sexual abuse allegations. PS testified that she wanted to return home because she missed her family and her dog.

During trial, one count of sexual abuse and the child abuse count were dismissed. Ten counts involving sexual acts and two counts involving sexual contact went to the jury. The jury acquitted petitioner of all but two counts of sexual abuse of a minor and two counts of sexual contact with a minor.

At the October 2011, sentencing hearing, defendant made a motion for a new trial on the basis that SS had recanted her trial testimony. The defendant introduced a letter written by SS addressed to me on the previous month wherein she claimed she was forced to say that her dad had touched her. The letter was not sent to me but instead was sent to Cindy. Cindy did not provide the letter to petitioner's attorney until three days prior to the scheduled sentencing hearing. SS stated in the letter that her dad had not touched her or PS. A guardian *ad litem* was appointed for SS and hearings on the motion for a new trial were held in January 2012. SS testified that her recantation was not true. I denied the motion for a new trial, finding that the recantation was not credible but was caused by a desire to be reunited with her baby sister and return home from group care. The government introduced recordings of telephone calls made by petitioner to Cindy following trial but before the sentencing hearing. Transcripts of those telephone calls were also provided to the Court. I made a finding that SS's recantation was instigated by the petitioner and Cindy.

## DECISION

### I. Tribal Court Counsel.

Petitioner contends that his constitutional rights were violated when an attorney who represented both petitioner and Cindy in tribal court abuse and neglect proceedings prior to the institution of federal charges collaborated with investigators to his detriment. Attorney Wendell arranged for Cindy to be interviewed by investigators and represented Cindy during that interview. The apparent purpose of the interview was to determine whether Cindy would cooperate with authorities and ensure the safety of the children if

8

they were returned to Cindy's custody. Cindy allegedly made statements during that interview incriminating petitioner. Petitioner claims that Wendell conspired with Cerney to threaten Cindy into making incriminating statements.

"The Sixth Amendment right to counsel has been interpreted to provide for representation that is 'free from conflicts of interest or divided loyalties.'" Caban v. United States, 281 F.3d 778, 781 (8th Cir. 2002) (*quoting* United States v. Reed, 179 F.3d 622, 624 (8th Cir.1999)). Petitioner's federal court attorney is not alleged to have acted under a conflict of interest. See United States v. Ramon-Rodriguez, 492 F.3d 930, 944-45 (8th Cir. 2007) (where trial counsel is not alleged to have labored under a conflict of interest, there is no prejudice). In fact, petitioner was not indicted until after the interview at issue and his Sixth Amendment right to counsel as to those charges had not yet attached. Kirby v. Illinois, 406 U.S. 682, 689-90, 92 S.Ct. 1877, 1882, 32 L.Ed.2d 411 (1972) (the Sixth Amendment right to counsel attaches upon the initiation of formal charges). Petitioner had no federal constitutional right to prevent Cindy from giving an interview. No federal court privilege could be asserted as to statements made during the interview because persons other than the attorney and client were present. Any right petitioner had as to attorney Wendell's actions were rights arising out of the attorney/client relationship which are a matter for the State Bar of South Dakota if the matter is brought to its attention.

## II. Trial Court Counsel.

Petitioner contends trial counsel was ineffective in 1) failing to investigate and call a material witnesses at trial, 2) failing to research the law regarding recording of interviews and make reasonable strategic decisions as to who to call as a witness, and 3) failing to impeach the credibility of prosecution witnesses.

To support a claim of ineffective assistance of counsel, a two prong test must be met. "To succeed on this claim, [petitioner] must show ineffective assistance--that counsel's representation fell below an objective standard of reasonableness." Wilcox v. Hopkins, 249 F.3d 720, 722 (8th Cir. 2001) (*quoting* Hill v. Lockhart, 474 U.S. 52, 59, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985)). Petitioner "must also prove prejudice by demonstrating that absent counsel's errors there is a reasonable probability that the result

of the proceeding would have been different." Delgado v. United States, 162 F.3d 981, 982 (8th Cir. 1998), (*citing* Strickland v. Washington, 466 U.S. 668, 694, 104 S. Ct. 2052, 2068, 80 L. Ed. 2d (1984)). The burden of establishing ineffective assistance of counsel is on the petitioner. Delgado v. United States, 162 F.3d at 982. Petitioner "'faces a heavy burden' to establish ineffective assistance of counsel pursuant to section 2255." DeRoo v. United States, 223 F.3d 919, 925 (8th Cir. 2000) (*quoting* United States v. Apfel, 97 F.3d 1074, 1076 (8th Cir. 1996)). "The Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight." Yarborough v. Gentry, 540 U.S. 1, 8, 124 S. Ct. 1, 6, 157 L. Ed. 2d 1 (2003).

**Failure to Investigate and Call a Fact Witness**. Petitioner contends counsel was ineffective in failing to interview or call the victims' aunt, Kayla. Petitioner contends Kayla would have rebutted PS's testimony that she spent time at aunt Kayla's to avoid being abused at home. Petitioner contends that aunt Kayla would have testified that PS lied about being at her house and would instead be running around McLaughlin. Petitioner further contends Kayla would have testified she never observed signs of physical or sexual abuse and neither alleged victim told her about abuse.

The Eighth Circuit has "stated that failing to interview witnesses or discover mitigating evidence may be a basis for finding counsel ineffective within the meaning of the Sixth Amendment right to counsel." Kramer v. Kemna, 21 F.3d 305, 309 (8th Cir. 1994). Petitioner has identified who the witness was that he contends should have been interviewed and what evidence should or could have been discovered as required. In addition to identifying what witnesses should have been interviewed, petitioner would be required to produce an affidavit from any witness that he contends should have been interviewed, or make some other substantial showing as to what the witness would have allegedly said had the witness been interviewed or called to testify. *See* Sanders v. Trickey, 875 F.2d 205, 210 (8th Cir. 1989). Petitioner would further be required to show that counsel was informed of the existence of any witnesses not called to testify. Counsel filed an affidavit denying she had been told about the possibility that Kayla was a witness.

10

There is no need to make a determination whether counsel was informed of the identity of this witness. Petitioner was able to get the proffered testimony in through other witnesses. The defense called Patrick Poitra, who counseled the victims beginning in June 2008 because of sibling fighting and discipline issues. He testified that they were extremely defiant, to the point that Cindy wanted to "give them back." He testified that there were times when the victims would be away from home without permission. (That evidence may not have been helpful as Poitra testified that staying away from home is sometimes a defense mechanism or a way of coping with abuse.) The defense called Dr. Matthew Scott Bennett, a clinical psychologist, who testified that, based upon his review of the educational and counseling records, the victims had been having behavioral and disciplinary problems for several years before the abuse allegations. Cindy testified that, shortly before the allegations were made, PS was going to have her television taken away because she was not coming home after school and "just wanted to be running around." Cindy also testified that when PS would babysit her cousin after school, PS "would take her and go where she wanted to go, like downtown or walk around" and that behavior would happen "pretty much all of the time after school." Petitioner called several witnesses who testified that the victims had a reputation in the community for lying. Many witnesses testified that they did not see signs of sexual or physical abuse and that, prior to PS's revelation to Elisa Kelley, neither victim told anyone about the abuse.

Even if petitioner could show that counsel was ineffective for failing to investigate and call Kayla as a witness at trial, petitioner cannot show prejudice. The evidence he contends should have been discovered and presented was presented through many other witnesses. There is no probability that the outcome of the trial would have been different had the witness been investigated or called as a witness at trial.

**Failure to Investigate the Law and Call a Government Witness.** Petitioner contends counsel was ineffective in failing to be aware of my previous decision in United States v. Azure, 1999 WL 33218402 (D.S.D. 1999), and in failing to call F.B.I. Agent Ted Miller as a witness at trial. Miller was present at Cindy's March 3 interview. That interview was not recorded by anyone. Petitioner contends that, had Miller testified,

11

petitioner would have been entitled to a jury instruction that I sometimes give when the F.B.I contends someone made a statement that they deny making. I give that limiting instruction orally in cases where the F.B.I agent testifies to one version of a statement made and the defendant testifies to another version. *See* United States v. Azure, *supra*. The essence of the instruction is to advise the jury that I have warned the F.B.I. that, when there is a question as to what the defendant stated during an interview, the jury, in making credibility determinations, can consider the fact that the F.B.I. refuses to tape or video record statements. Contrary to petitioner's arguments, Azure was not an order to the F.B.I. to record statements. The only effect of Azure is the "penalty" of an oral limiting instruction telling the jury that they may consider any failure to tape or video record in determining whether a defendant made an alleged statement.

This is not the typical Azure case. It is not the defendant's statement that was at issue but instead the statement of a witness. And this is not a case where the F.B.I. agent claims the defendant made an admission and the defendant claims he did not make the statement. In this case, Cindy testified for the defendant in his case in chief and denied having made statements that incriminated petitioner. Three witnesses, including Cindy's own tribal court attorney, testified during the government's rebuttal that Cindy made statements incriminating petitioner. Counsel is correct in her affidavit that Agent Miller's testimony would have been cumulative. We can also assume that his testimony would have been contrary to the petitioner's interests.

Petitioner contends that Agent Miller should have been called to determine whether he prepared a written report of Cindy's interview. Lawrence prepared the report of that interview. As with Lawrence's report, any report prepared by Miller, if one did exist, would not be admissible in evidence.

Petitioner cannot show that it was not within the bounds of reasonable trial strategy to keep Miller off the witness stand. Miller's testimony would surely only have bolstered the government's evidence that Cindy lied at trial. Even if counsel was ineffective in failing to call Miller as a witness, petitioner cannot show prejudice. The jury was aware that none of those who interviewed Cindy on March 3, 2011, recorded the

interview. Cindy asked three of the rebuttal witnesses on cross examination whether they had recorded the interview and each stated that the interview was not recorded.

There is no probability that the jury would have rejected four witnesses' testimony as to what Cindy had said even if the jury were cautioned about the failure to tape or video record the interview.

Petitioner contends that counsel should have researched the Azure decision and, based upon that decision, moved to suppress Cindy's alleged statements made during the March 3 interview, and also should have objected to the admission of such statements at trial. Again, petitioner misunderstands the effect of Azure. Failure to tape record a witness does not result in any right to suppression of statements made during such an unrecorded interview. Further, there is no right to the suppression of a witness's statement.

Counsel vehemently sought to exclude the prosecution's rebuttal witnesses and any testimony about Cindy's statements made during the interview on the basis that Wendell's participation violated petitioner's attorney/client privilege. Counsel's arguments were rejected as having no legal basis. I did not make that decision based upon any lack of knowledge of the law but instead based upon my knowledge of the law. Petitioner cannot show that the outcome of his trial would have been different if his attorney had asserted he had some right under Azure.

**Failure to Impeach Witnesses**. Petitioner contends counsel failed to impeach the government's rebuttal witnesses. Petitioner contends that Cindy was threatened into making any alleged incriminating statements during her March 3, 2011, interview. He contends that Cerney, Wendell, and the government's investigators conspired to threaten Cindy with indictment and a 30 year mandatory minimum sentence if she did not cooperate.

Petitioner appears to be contending that counsel was ineffective for failing to establish, by cross-examination, that Cindy was threatened into making incriminating statements at the March 3 interview. However, Cindy had already testified on direct examination that she made no incriminating statements during that interview. She

13

testified, contrary to the testimony of the victims, that the victims did not report any alleged abuse to her, that she never confronted petitioner about abuse, and that the petitioner did not punch a hole in PS's bedroom wall after being confronted about sexual abuse. It would not have been reasonable trial strategy to change course during the government's rebuttal and contend that Cindy did make incriminating statements during the interview but only after being threatened with prosecution.

## III. Prosecutorial Misconduct.

Petitioner contends that his Fifth and Sixth Amendment Constitutional rights were violated by the government. Section 2255 provides federal prisoners a remedy for claims that their "sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." 28 U.S.C. § 2255(a). The remedy "does not encompass all claimed errors in conviction and sentencing." Sun Bear v. United States, 644 F.3d 700, 704 (8th Cir. 2011) (*quoting* United States v. Addonizio, 442 U.S. 178, 185, 99 S.Ct. 2235, 60 L.Ed.2d 805 (1979)). It is well-recognized that, as a general rule, prosecutorial misconduct does not merit federal habeas relief unless the misconduct "so infected the [proceedings] with unfairness as to make the resulting conviction a denial of due process" Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471-72, 91 L.Ed.2d 144 (1986) (*quoting* Donnelly v. DeChristoforo, 416 U.S. 637, 643, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1974)). *Accord*, Roberts v. Bowersox, 137 F.3d 1062, 1066 (8th Cir. 1998), Louisell v. Dir. of Iowa Dept. of Corr., 178 F.3d 1019, 1023 (8th Cir. 1999), and Stringer v. Hedgepeth, 280 F.3d 826, 829 (8th Cir. 2002).

Petitioner contends that the government interfered with his attorney-client relationship when, prior to indictment, the F.B.I. agent interviewed his wife, Cindy, without his knowledge. Petitioner had no right to prevent any witness from being interviewed and he had no right notice that any witness would be interviewed.

Petitioner further contends that the government violated a court order when the interviews of the victims and Cindy were not recorded. As I have previously set forth,

14

there is no court order and no court decision requiring that interviews be recorded. There certainly is no Constitutional right to have interviews recorded.

Petitioner contends that the prosecutor knew petitioner was represented by Wendell and that Wendell was operating under a conflict of interest in arranging and participating in Cindy's interview. Wendell represented petitioner in tribal court abuse and neglect proceedings. As stated previously, petitioner's Constitutional right to the assistance of counsel as to his federal charges had not attached.

There was no prosecutorial misconduct in working with Wendell to interview Cindy. Any action on the part of Wendell that may have been a violation of petitioner's attorney-client relationship with Wendell is not a matter for federal habeas review but, as stated earlier, is a matter for the State Bar of South Dakota.

## IV. Evidentiary Hearing.

The district court must hold an evidentiary hearing on a § 2255 motion which presents factual issues. United States v. Lambros, 614 F.2d 179, 181 (8th Cir. 1980). However, a § 2255 "petition can be dismissed without a hearing if (1) the petitioner's allegations, accepted as true, would not entitle the petitioner to relief, or (2) the allegations cannot be accepted as true because they are contradicted by the record, inherently incredible or conclusions rather than statements of fact." Delgado v. United States, 162 F.3d 981, 983 (8th Cir. 1998) (*quoting* Engelen v. United States, 68 F.3d 238, 240 (8th Cir. 1995)). No evidentiary hearing is necessary in this matter because it plainly appears from the face of the motion, after an extensive review of the record, that the petitioner is not entitled to relief. Summary dismissal is therefore appropriate pursuant to Rule 4 of the Rules Governing Section 2255 Proceedings for the United States District Courts.

## ORDER

Now, therefore,

IT IS ORDERED that the motion to vacate, set aside, or correct sentence is denied.

## TO THE UNITED STATES COURT OF APPEALS FOR THE EIGHTH CIRCUIT:

Petitioner was convicted of sexual abuse of a minor and abusive sexual contact and was sentenced to 71 months imprisonment. His direct appeal was denied. Petitioner filed a motion to vacate, set aside, or correct sentence pursuant to 28 U.S.C. § 2255 contending that his Fifth and Sixth Amendment Constitutional rights were violated. I summarily denied the motion to vacate pursuant to Rule 4 of the Rules Governing Section 2255 Proceedings for the United States District Courts.

Pursuant to 28 U.S.C. § 2253, a certificate of appealability may issue only if the applicant has made a substantial showing of the denial of a constitutional right. Petitioner did not and has not made a substantial showing of the denial of a constitutional right.

**IT IS HEREBY CERTIFIED** that there does not exist probable cause of an appealable issue with respect to the Court's order denying petitioner's § 2255 motion. Any application for a certificate of appealability is denied. This in no way hampers the petitioner's ability to request issuance of the certificate by a United States Circuit Judge pursuant to Fed. R. App. P. 22.

DATED this 4th day of January, 2016.

BY THE COURT:

CHARLES B. KORNMANN
United States District Judge